UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRIDGET BRUNO,                    :        Case No. 1:16-cv-245
                                  :
        Plaintiff,                :        Judge Timothy S. Black
vs.                               :
                                  :
RBS CITIZENS, NA, *et al.*        :
                                  :
        Defendants.               :

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
(Doc. 20)**

This civil action is before the Court on the motion of Defendant Citizens Bank,

N.A., a subsidiary of Citizens Financial Group, Inc. ("Citizens"), for summary judgment

(Doc. 20) and the parties' responsive memoranda (Docs. 21, 30).

## I.        BACKGROUND FACTS

This is an employment dispute. Plaintiff Bridget Bruno worked for Citizens as a

Group Underwriting Manager at Citizens' Home Lending Solutions ("HLS") site in

Cincinnati ("Cincinnati Site") from November, 2009, to October 7, 2014.

Citizens' HLS division offers residential mortgage and home equity loans. Ms.

Bruno was authorized to approve loans of $1,000,000 or less. In 2014, Ms. Bruno

requested an increase in lending authority. Citizens ultimately denied her request. On

May 23, 2014, Ms. Bruno's attorney Jason Matthews ("Attorney Matthews") wrote a

letter to Citizens alleging this denial was the result of age and sex discrimination (the

"May 23, 2014 Letter").

1

In the fall of 2014 Citizens "spun off" from its corporate parent, the Royal Bank of Scotland. As part of this transition, Citizens underwent a corporate initiative aimed at reducing its workforce to eliminate redundant positions; specifically, Citizens endeavored to eliminate a layer of management where possible (the "Reduction in Force").

At the Cincinnati Site, prior to the Reduction in Force, underwriters reported to Regional Underwriting Managers, the Regional Underwriting Managers reported to the Group Underwriting Manager (Ms. Bruno), and the Group Underwriting Manager reported to the Regional Operations Group Manager/Cincinnati Vice President (William Terry). Accordingly, there were two layers of management between the underwriters and Mr. Terry.

During its 2014 restructuring, Citizens decided that the two-layer management structure utilized at the Cincinnati Site was unnecessary for a group of its size. As a result, in October, 2014, Citizens eliminated the Group Underwriting Manager Position at the Cincinnati Site and Ms. Bruno lost her job. Ms. Bruno found another job in November, 2014.

On October 21, 2014, Ms. Bruno filed a charge with the Ohio Civil Rights Commission ("OCRC") alleging she was terminated in retaliation for the May 23, 2014 Letter. On September 30, 2015, the Equal Employment Opportunity Commission ("EEOC") sent a separate right-to-sue notice (the "Right-to-Sue Notice"). On January 19, 2016, Ms. Bruno commenced this lawsuit, alleging unlawful retaliation in violation of Title VII of the Civil Rights Act and Ohio Rev. Code § 4112.02.

On January 20, 2017, Citizens filed the instant motion for summary judgment, arguing that Ms. Bruno's Title VII claim is barred by the applicable statute of limitations, and her retaliation claims fail on the merits.

## II.        UNDISPUTED FACTS[1]

1.        Citizens is one of the leading commercial banking companies in the United States. Its HLS division offers residential mortgage and home equity loans based out of four locations— Warwick, Rhode Island ("Rhode Island Site"); Glen Allen, Virginia ("Virginia Site"); Melville, New York ("New York Site"); and the Cincinnati Site. (Doc. 26 at 28:24- 29:10).

2.        Ms. Bruno began working for Citizens in November 2009 as a Group Underwriting Manager and remained in this position throughout her employment with Citizens. (Doc. 24 at 67:19-22; 223:6-10).

3.        Ms. Bruno's immediate supervisor was Mr. Terry, the HLS Regional Operations Group Manager/Vice President in the Cincinnati office. (Doc. 25 at 8:24-9:23).

4.        Mr. Terry reported to Matthew Egan, the HLS National Operations Manager, who is based near Philadelphia. (Doc. 26 at 10:9-11:11).

5.        Mr. Egan reported to Cheryl Nolda, who was involved in the Reduction in Force at a high level but did not participate in individual, site-level determinations

---

[1] *See* Doc. 20-1 and Doc. 23.

regarding which positions would be eliminated at each location. (Doc. 26 at 60:17-61:11).[2]

6.     When Ms. Bruno began at working at Citizens, she was the sole manager within the Cincinnati underwriting department, and individual underwriters reported directly to her. (Doc. 24 at 68:18-21).

7.     In 2010, Bruno hired two Regional Underwriting Managers. The individual underwriters then reported to one of the Regional Underwriting Managers, who in turn reported to Plaintiff. (Doc. 24 at 70:8-19).

8.     In 2014, the Cincinnati Regional Underwriting Managers were Greg Barton and Janine Dabney-Battle. (Doc. 25 at 39:20-24; Doc. 20-10).

9.     At the HLS location in New York, there were only a few underwriters, all of whom reported directly to Group Underwriting Manager Peggy Miceli, with no intervening layer of Regional Underwriting Managers. (Doc. 24 at 100:23-101:8; Doc. 26 at 35:3-6, 51:6-12).

---

[2] Ms. Bruno denies a portion of this Paragraph, as well as some or all of the facts asserted in Paragraphs 10, 11, 12, 25, 26, 32, 33, 34, 35, 36, 37, 38, 39, and 42 of this section, without providing a citation to any evidence in the record which supports her denial. Such failure violates this Court's Standing Order Governing Civil Motions for Summary Judgment.  The Standing Order requires that "[e]ach statement of material fact in a statement of Proposed Undisputed Facts or Response to Undisputed Facts, and each denial in a statement of Disputed Issues of Material Fact, must be followed by a specific citation or citations to (1) the affidavit of a witness competent to testify as to the facts at trial, (2) a sworn deposition, and/or (3) other evidence, including documentary evidence, that would be admissible at trial."

10.     At the HLS Virginia location, there was one Group Underwriting Manager, Chip Owens, and one Regional Underwriting Manager. (Doc. 26 at 34:25-35:2).

11.     Roughly half of the Virginia underwriters reported directly to Mr. Owens, the Group Underwriting Manager, and the remainder reported to the Regional Underwriting Manager (who in turn reported to Mr. Owens). (Doc. 26 at 34:25-35:2).

12.     Ryan Gausland, the Group Underwriting Manager in Rhode Island, had three Regional Underwriting Managers who reported to him. (Doc. 26 at 35:11- 15).

13.     Underwriters and underwriting managers at Citizens have a preset lending authority that limits the maximum size of a loan that he or she can approve unilaterally. (Doc. 24 at 27:8-19).

14.     An underwriter may underwrite loans in excess of his or lending authority, but the work is subject to a further level of review. (Doc. 24 at 32:7-21).

15.     Ms. Bruno's lending authority was set at $1,000,000. (Doc. 24 at 28:6-9).

16.     Ms. Bruno requested higher credit authority beginning in the summer of 2010, less than a year after she joined the bank. (Doc. 24 at 85:17-21).

17.     A higher lending authority would not have changed Ms. Bruno's title or her pay. (Doc. 24 at 83:6-14).

18.     Both Mr. Egan and Mr. Terry supported Ms. Bruno's request for a higher lending authority. (Doc. 24 at 43:9-14, 51:13-52:1; Doc. 25 at 43:2-8).

19.     Lending authority limits are not set by Ms. Bruno's direct supervisors. (Doc. 26 at 66:22-67:4).

20.     Those limits are set by Citizens' Consumer Credit Risk Administration, a separate and independent business unit with the authority to adjust limits on an individual-by-individual basis. (Doc. 24 at 44:17-45:8; 54:3-13).

21.     In January 2014, Ms. Bruno renewed her request for higher lending authority and was asked to complete a series of "test cases," which is common industry practice when an underwriter requests increased lending authority. (Doc. 24 at 86:25-87:23, 88:18-89:1).

22.     To complete these test cases, Ms. Bruno was asked to underwrite loans of over $1,000,000, which would then be audited and graded. (Doc. 24 at 87:18- 88:4, 120:14-17).

23.     Ms. Bruno responded that she had previously completed other test cases, but Citizens informed her that those cases were not recent enough to evaluate. (Doc. 24 at 86:25-87:14; Doc. 20-9).

24.     All but one of the test cases date from 2011, meaning they were between two and three years old at the time of Ms. Bruno's e-mail. (Doc. 20-9).

25.     In addition, some of these earlier test cases received a "red mark," which represents a "very serious defect" in the underwriting process that may affect the salability of the loan. (Doc. 24 at 118:22-119:14).

26.     Citizens created a formal plan for Ms. Bruno to complete several test cases to justify her increased authority.  (Doc. 24 at 86:25-87:23, 88:10-17).  She refused to complete even a single test case.  (Doc. 24 at 91:20-92:1).  As a result, her lending authority remained the same. Peggy Miceli, who like Ms. Bruno is a female over the age of 40, *did* complete her assigned test cases, and her lending authority was increased to $1,500,000.  (Doc. 24 at 99:11-100:5).

27.     In May 2014, Attorney Matthews wrote a letter alleging "age and sex discrimination" based on Ms. Bruno's allegedly insufficient lending authority.  (Doc. 24-1 at 3-4).

28.     Attorney Matthews also made a vague complaint of a hostile work environment.  (Doc. 24-1 at 3-4).

29.     The May 23, 2014 Letter was not directed at Mr. Terry or Mr. Egan; they had no control over Ms. Bruno's lending authority.  (Doc. 24 at 43:14-16; Doc. 26 at 66:22-67:4).

30.     The May 23, 2014 Letter was directed at "people that worked in the bank that were above [Ms. Bruno] *in other departments*…"  (Doc. 26 at 29:1-2).

31.     Citizens conducted an investigation regarding Ms. Bruno's allegations.  (Doc. 24 at 35:19-36:14).

32.     Citizens ultimately concluded that there were a few "curt" e-mails between Ms. Bruno and various sales employees— with Ms. Bruno both sending and

receiving such emails—but there was no finding of wrongful conduct. (Doc. 24 at 37:10-38:2).

33.     No discipline was issued, and Citizens considered the matter closed. (Doc. 25 at 12:11-21, 15:11-24; Doc. 26 at 25:1-8).

34.     Prior to 2014, Citizens was known as RBS Citizens, N.A., and was a subsidiary of the Royal Bank of Scotland. Around September 2014, Citizens separated from the RBS umbrella. (Doc. 26 at 8:22-9:8).

35.     As part of this spin-off, Citizens underwent a broad corporate-wide restructuring to reduce expenses and eliminate redundant positions across its divisions. (Doc. 26 at 36:20-37:22, 39:13-19).

36.     The ultimate goal of the restructuring was to reduce expenses by eliminating a layer of management wherever possible, across all sites in the HLS Division. (Doc. 25 at 27:19-28:13; Doc. 26 at 37:23-38:6).

37.     Citizens' management individually reviewed the staffing at each site to determine what best fit that particular site's business needs moving forward. (Doc. 26 at 40:18-41:1).

38.     At the Cincinnati Site, there was a surplus of managerial employees within the underwriting department—one Group Underwriting Manager (Ms. Bruno) and two Underwriting Managers who reported directly to her. (Doc. 26 at 37:23-38:6, 42:12-43:1; Doc. 20-10).

39. This two-layer management structure was deemed unnecessary for a group consisting of only twenty-two underwriters, and Citizens chose to eliminate Ms. Bruno's position. (Doc. 25 at 24:5- 11; Doc. 26 at 38:25-39:21).

40. After the reduction in force, the former Regional Underwriting Managers now reported directly to Mr. Terry, thus eliminating a layer of management. (Doc. 26-1 at 3).

41. There was an open position within the Cincinnati processing department, so former Group Processing Manager Sean Cunningham was offered a demotion to a slightly lower ranking position, which he accepted. (Doc. 25 at 30:3-20).[3]

42. The Group Underwriting Manager position at the Rhode Island Site was eliminated and Mr. Gausland moved to an open "pod leader" position within the processing department because he had prior experience there. (Doc. 26 at 44:23-45:9, 49:5-9; Doc. 26-1 at 1-2).

43. Mr. Owens was likewise demoted to an underwriting manager position, where he directly supervised underwriters. (Doc. 26-1 at 1-2).

44. There were no open positions for Ms. Bruno within the Cincinnati underwriting department; in fact, there was a surplus of underwriters, and one was laid off as part of the Reduction in Force. (Doc. 25 at 30:21- 25).[4]

---

[3] Ms. Bruno denies there was an open position and states that Kim Slavens was moved from a processing manager position to an underwriting position and Sean Cunningham was moved into Kim Slaven's position. (Doc. 23 at ¶ 41) (citing Doc. 26 at 64-65).
[4] Ms. Bruno denies this assertion, arguing that Mr. Egan testified Mr. Terry could have chosen to terminate either Ms. Bruno, Mr. Barton or Ms. Dabney Battle and Kim Slavens

45. The Reduction in Force was announced on October 7, 2014, which was the last day Ms. Bruno performed work for Citizens. (Doc. 24 at 21:21-23).

46. Ms. Bruno remained on the Citizens payroll until October 24, 2014, which is the effective date of her termination. (Doc. 14 at ¶ 10).

47. Ms. Bruno found a new job one month later. (Doc. 24 at 174:25-175:5).[5]

48. On October 21, 2014, Ms. Bruno filed a charge with the OCRC, alleging that she was terminated in retaliation for the May 23, 2014 letter. (Doc. 24-1).[6]

49. After an investigation, the OCRC issued a finding of no probable cause and stated that "the Commission finds no credible information supporting Charging Party's allegation of unlawful activity." (Doc. 24-1 at 2).

50. The EEOC sent the Right-to-Sue Notice on September 30, 2015. (Doc. 14-1).

## III.     STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex*

---

was moved from a processing manager position to an underwriting position. (Doc. 23 at ¶ 44) (citing Doc. 26 at 43; 64-65).

[5] Ms. Bruno admits that she began her new employment on either November 26, 2017, or November 27, 2017. (Doc. 23 at ¶ 47) (citing Doc. 24 at 175).

[6] Ms. Bruno admits she signed her OCRC charge on October 21, 2014 and the charge was filed on October 22, 2014, alleging retaliation for the May 23, 2014, letter. (Doc. 23 at ¶ 48).

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

# IV.    ANALYSIS

## A.    Ms. Bruno's Title VII claim is NOT barred by the statute of limitations.

Defendants argue Plaintiff's Title VII claim is untimely.  (Doc. 20 at 10-11).  The Court does not agree.

Title VII requires a charge of discrimination to be filed with the EEOC (or applicable state agency) within 300 days after the alleged act of discrimination occurs. 42 U.S.C. § 2000e-5(e)(1).  Title VII requires a civil action to be filed in federal court within 90 days after the EEOC has given a "right-to-sue" notice.  42 U.S.C. § 2000e-5(f)(1).  The requirement that a civil action be filed within 90 days is not a "jurisdictional prerequisite to suit in a federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling."  *Simmons v. Ohio Civ. Serv. Emp. Assoc. AFSCME Local 11*, 259 F. Supp. 2d 677, 681 (S.D. Ohio 2003) (Sargus, J) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)).

In the Sixth Circuit, a right-to-sue notice mailed by the EEOC is presumed to have been received, and the 90-day statute of limitations begins to run, on the fifth day after the mailing date.  *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000).  However, a plaintiff may rebut this presumption by presenting proof that he did not receive the right-to-sue notice.  *Id.* at 557.

The Sixth Circuit has identified five factors to consider when determining whether to equitably toll a statute of limitations: (1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing

12

one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement. *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998).

Here, each of these factors weighs in favor of tolling the 90-day limitations period. There is no evidence to suggest Ms. Bruno had actual or constructive knowledge that her 90-day limitations period began to run on September 30, 2015; the undisputed evidence is that she did not receive the Right-to-Sue Notice until January 6, 2016. (Doc. 22 at ¶ 22). Ms. Bruno acted diligently once she became concerned that she had not received the Right-to-Sue Notice; in December, 2015, she called the OCRC every day for two weeks. (Doc. 22 at ¶¶ 17-18). Tolling the limitations period for the Title VII claim will not prejudice Citizens, as it will have to defend Ms. Bruno's state law claim—premised on identical allegations—regardless of whether the Title VII claim proceeds. Finally, the Court does not believe that Ms. Bruno remained ignorant of any legal requirement.

In these circumstances, the Court finds it appropriate to equitably toll the 90-day limitations period until January 6, 2016, when Ms. Bruno first received the Right-to-Sue Notice. *See Schmidlin v. Uncle Ed's Oil Shoppes, Inc.*, Case No. 2:13-cv-10552, 2014 U.S. Dist. LEXIS 100641 at ** 12-15 (E.D. Mich. July 24, 2014) (finding affidavit testimony that plaintiff did not receive the right-to-sue notice, along with evidence that plaintiff attempted to contact the EEOC on several occasions, sufficient to equitably toll the 90-day period).

Citizens argues that federal courts only "sparingly" bestow equitable tolling. (Doc. 30 at 15). After a thorough review of Sixth Circuit case law on this issue, the Court agrees. However, in refusing to toll the 90-day limitations period, courts in this Circuit typically cite to one of four reasons, none of which apply here.

First, courts refuse to toll the 90-day limitations period where the plaintiff provides only "vague" testimony regarding receipt of the right-to-sue notice. *See Fuller v. Mich. DOT*, 580 Fed. App'x 416, 424-25 (6th Cir. 2014) (finding plaintiff did not provide sufficient evidence to rebut the five-day presumption of notice when he testified that he received the right-to-sue notice "a week or two" after it was mailed and did not recall the specific date).

Second, courts refuse to toll the limitations period where the plaintiff had knowledge or suspicion that the EEOC had issued a right-to-sue notice. *See Graham-Humphreys*, 209 F.3d at 561-62 (equitable tolling not available when plaintiff ignored notice of certified mail which she acknowledged she "suspected" contained a right-to-sue notice).

Third, courts have refused to toll the limitations period where the plaintiff bears some fault for not receiving the notice on time. *See Banks v. Rockwell International North American Aircraft Operations,* 855 F.2d 324, 326-27 (6th Cir. 1988) (refusing to toll 90-day limitations period where plaintiff did not receive the right-to-sue because he failed to notify the EEOC of a change of address) (*citing Hunter v. Stephenson Roofing Co.*, 790 F.2d 472, 474-75 (6th Cir. 1986)).

14

Fourth, courts have refused to toll the limitations period where the plaintiff received the letter more than five days after mailing, but still within the 90-day limitations period. *See Graham-Humphreys*, 209 F.3d at 561 (citation omitted) (denying equitable tolling because the plaintiff still had 74 days after actual receipt of her right-to-sue notice to file a civil complaint).

Here, none of the reasons typically relied on by courts in this Circuit for denying equitable tolling are present. There is no evidence to suggest that Ms. Bruno was at fault for not receiving the Right-to-Sue Notice. She did not have actual or constructive knowledge of the Right-to-Sue Notice until after the expiration of the original 90-day period. (Doc. 22 at ¶ 22). Finally, there is no vague or inconsistent evidence as to the date of receipt. Ms. Bruno asserts that she did not receive the Right-to-Sue Notice until January 6, 2016, and that assertion is not contradicted by any evidence in the record. (*Id.*).

The Court finds that Ms. Bruno has sufficiently rebutted the presumption that she received the Right-to-Sue Notice five days after it was sent, and the start of the 90-day limitations period should be equitably tolled until January 6, 2016. As Ms. Bruno filed

the Complaint on January 19, 2016, just 13 days later, Citizens' request for summary judgment on the grounds that the Title VII claim is untimely is **DENIED**.

### B. <u>Citizens is entitled to judgment as a matter of law on the merits.</u>

Title VII prohibits an employer from discriminating against any employee "because he has opposed any practice made 'an unlawful practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" 42 U.S.C. § 2000e-3.[7]

In an action under Title VII, the plaintiff may prove unlawful retaliation by either (1) presenting direct evidence of retaliation or (2) by raising an inference of retaliation. *See Novotny v. Reed Elsevier*, No. C-3-05-424, 2007 U.S. Dist. LEXIS 66608 at * 65 (S.D. Ohio Sept. 10, 2007) (Rose, J) (citing *Haughton v. Orchid Automation*, 206 F. App'x 524, 530 (6th Cir. 2006)).

Direct evidence is evidence which, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000)). Stated another way, evidence is "direct" if it is capable of proving unlawful retaliation "without any inferences or presumptions." *Id.* (citation omitted).

---

[7] Ms. Bruno brings claims for retaliation pursuant to Title VII of the Civil Rights Act of 1964 and Ohio Revised Code Section 4112.02. Because federal and state law retaliation claims are governed by the same standards, the claims will be considered together. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541-42 (6th Cir. 2003).

Here, Ms. Bruno does not offer any direct evidence of retaliation and instead asks the Court to infer retaliation from the timing and circumstances of her discharge. (*See* Doc. 21 at 9-14). Therefore, her claim will be reviewed using the three-step *McDonnell Douglas* burden shifting analysis. *Novotny*, 2007 U.S. Dist. LEXIS 66608 at * 65 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Under the first step, Ms. Bruno must initially establish a *prima facie* retaliation case by showing (1) she engaged in a protected activity, (2) Citizens knew about the protected activity, (3) Citizens took an adverse employment action against the employee, and (4) there was a causal connection between the protected activity and the adverse action. *See Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). Typically, the burden of establishing a *prima facie* case in a retaliation action is not onerous, but one

easily met. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).[8]

If a plaintiff succeeds in establishing a prima facie retaliation case, the burden

shifts to the defendant to articulate a nondiscriminatory reason for its actions. *Mickey v.*

*Zeidler Took & Die Co.*, 516 F.3d 516, 562 (6th Cir. 2008) (citation omitted). If the

defendant articulates such a reason, the plaintiff may then show that the defendant's

stated reason is merely a pretext for discrimination. *Id.*

### 1. Ms. Bruno has not shown a prima facie case of discrimination.

---

[8] Citizens argues Ms. Bruno faces a "heightened" burden at this first step because she was discharged as part of the Reduction in Force. (Doc. 20 at 28). The Court does not agree. The cases cited by Citizens in support of this proposition involve claims for unlawful <u>discrimination</u> as opposed to unlawful <u>retaliation</u>. This distinction is critical because a *prima facie* case of discrimination requires a plaintiff to show that she (1) is a member of a protected class; (2) was qualified for the job or promotion sought; (3) experienced an adverse employment action; and (4) was replaced by someone outside of the protected class. *See Simpson v. Vanderbilt Univ.*, 359 Fed. App'x 562, 568-69 (6th Cir. 2009).

An employee who is discharged as part of a reduction in force generally cannot show the fourth element of a <u>discrimination</u> claim (that she was replaced). That is why courts require those plaintiffs to also show "additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* Without this additional requirement, every member of a protected class who was included in a workforce reduction would be able to establish a *prima facie* case of discrimination. *Id.*

Here, Ms. Bruno's retaliation claim already requires her to show a causal connection between her protected activity and discharge, and accordingly, the concerns which lead the Sixth Circuit to require an additional showing in reduction in force discrimination cases are not present. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (finding the *Barnes* "additional-evidence" requirement irrelevant to a claim for FMLA discrimination because the plaintiff was already required to show, *inter alia*, "a nexus between her pregnancy and the adverse employment decision.").

Defendants concede for purposes of their motion that Ms. Bruno has raised an issue of fact as to the first three factors of a retaliation claim, but argue Ms. Bruno cannot show the fourth factor, causation, "because there is no evidence from which any reasonable finder of fact could conclude that Plaintiff's October 2014 termination was caused by the May 2014 letter." (Doc. 20 at 19).

To meet the "causal connection" requirement, a plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). The Supreme Court has made clear that a "but-for" standard of causation, rather than the less demanding "motivating factor" standard, applies in Title VII retaliation cases. *Id.* at 2533-34. Accordingly, to establish a *prima facie* case of retaliation, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534.

Ms. Bruno argues there is a causal connection between the May 23, 2014 Letter and the termination of her employment because (1) temporal proximity exists between Citizens' receipt of the letter and its decision to discharge Ms. Bruno; (2) Ms. Bruno was treated adversely by Mr. Terry after complaining of sex discrimination; (3) Mr. Terry and Mr. Egan are not willing to accept responsibility for making the decision to discharge Ms. Bruno and (4) Ms. Bruno was the only person in her position or salary grade who was terminated in connection with the alleged reorganization. (Doc. 21 at 9-14).

### a. *Temporal proximity in this case does not establish a causal connection.*

19

Plaintiff argues the temporal proximity between the May 23, 2014 Letter and her discharge is sufficient to infer retaliation. (*Id.* at 9-11). The Court does not agree.

Though Sixth Circuit case law on the issue is expansive, there is no "bright line" rule for when a court may infer causation solely from the temporal proximity between the employee's protected activity and the adverse employment action.

On one hand, the Sixth Circuit has expressly stated "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro Gov't*, 474 F.3d 307, 321 (6th Cir. 2007) (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001) and *Nguyen*, 229 F.3d at 566 (6th Cir. 2000)).[9] According to this line of cases, temporal proximity must be combined "with other evidence of retaliatory conduct to establish a causal connection." *See Tuttle*, 474 F.3d at 321 (finding a causal connection when plaintiff was terminated less than three months after she filed a complaint with the EEOC and, prior to termination, was threatened by a human resources manager).

On the other hand, the Sixth Circuit has held "in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (citations omitted); *Asmo*, 471 F.3d at 593 ("[t]emporal proximity can establish a causal

---

[9] *Nguyen* is frequently cited for the proposition that temporal proximity cannot establish causation, but the Sixth Circuit expressly stated in its opinion that "there may be circumstances where temporal proximity alone would be sufficient." 229 F.3d at 567.

connection between the protected activity and the unlawful employment action in the retaliation context"); *Brown v. ASD Computing Ctr.*, 519 F. Supp. 1096, 1116 (S.D. Ohio 1981) (Rice, J) ("where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise") (citation omitted).

The Sixth Circuit reconciled these two lines of cases in *Mickey*, reasoning that the issue is whether enough time has passed between the employer's knowledge of the protected activity and the adverse employment action to allow the employee to produce other evidence of retaliatory conduct:

> [t]he two lines of cases are fully reconcilable. Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. *See Little,* 265 F.3d at 365 ("[T]emporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection.).

> The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

516 F.3d at 525.

After *Mickey*, the Sixth Circuit has explained that temporal proximity, alone, can create an inference of retaliation when the adverse employment action occurs "very close" in time after the employer learns of a protected activity such that the circumstances create an inference the employer acted with impermissible motives. *See Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009).

Initially, the parties disagree as to the relevant period of time for the temporal proximity analysis. Citizens argues five months passed between its receipt of the May 23, 2014 Letter and Ms. Bruno's last day of work on October 7, 2014. (Doc. 20 at 14). Ms. Bruno argues the period could be as short as three months, and points to what purports to be an organizational chart of the Cincinnati Site, dated August 29, 2014, that does not include the Group Underwriting Manager position as part of the Cincinnati Site's underwriting management. (Doc. 21 at 10).

The Court agrees with Ms. Bruno that the relevant period of time is the date Citizens became motivated to terminate her, not when she learned of her discharge. *See Haji v. Columbus City Schs.*, 621 Fed. App'x 309, 313 (6th Cir. 2015). Unfortunately, that date is unclear. Ms. Bruno has the burden at this stage to point to facts in the record indicating that temporal proximity exists from which the Court can infer causation, but she has not set forth any affirmative evidence demonstrating when Citizens made the decision to eliminate her position. In light of the Sixth Circuit's instruction that causation may be inferred from timing alone only when the adverse employment action occurs

"very close" to the protected activity, the Court will not infer causation in the absence of affirmative evidence as to when that decision occurred.

In any event, even if the Court were to agree with Ms. Bruno that the adverse employment action occurred three months after the protected activity, this, in and of itself, would not show causation. Courts have reached inconsistent conclusions on whether a period of three months in between the protected activity and subsequent adverse employment action is short enough to infer a causal connection. *See Basch v. Knoll, Inc.*, 619 Fed. App'x 457, 461 (6th Cir. 2015) ("[a]bsent other evidence, three months does not suffice to support a finding of causation"); *but see Haji*, 621 Fed. App'x at 313 ("in an appropriate case, a gap of three months between the time the employer learns of the protected activity and the adverse employment action may permit a jury to draw a causal-connection inference.") (citation omitted). However, on the facts of this case, and in light of the fact that Ms. Bruno essentially concedes her position was eliminated due to the Reduction in Force,[10] the Court refuses to draw the inference from timing alone that Defendants acted with impermissible motives.

### b. There is no "other evidence of retaliatory conduct."

---

[10] In her response to Citizens' Statement of Proposed Undisputed Facts, Ms. Bruno denied "due to a lack of knowledge" Citizens' assertions that it eliminated the Cincinnati Group Underwriting Manager position as part of a 2014 initiative to eliminate a layer of management where possible. (Doc. 23 at ¶¶ 34-37, 39). Not only does her failure to support her denial with evidence in the record violate this Court's Standing Order Governing Motions for Summary Judgment, but it is insufficient to meet her burden at this stage to "set forth specific facts showing that there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Having found that temporal proximity alone is insufficient, the Court now considers whether there is "other evidence of retaliatory conduct" sufficient to show causation.

Ms. Bruno argues she "was treated adversely" by Mr. Terry after complaining of sex discrimination. (Doc. 21 at 11). First, Ms. Bruno argues that, prior to her complaint, she was permitted to attend personal appointments during the day, and after the May 23, 2014 Letter, Mr. Terry was stricter about requiring her to make up time she missed. (*Id.*). Second, Ms. Bruno argues that Mr. Terry requested she reschedule her vacation, despite not making a similar request prior to the May 23, 2014 Letter. (*Id.*). Third, Ms. Bruno argues that, after the May 23, 2014 Letter, Mr. Terry sent multiple emails questioning her decisions. (*Id.*).

These arguments are not well-taken. Initially, conclusory allegations of harassment or scrutiny like those asserted by Ms. Bruno are insufficient to create a genuine issue of fact as to the "causal connection" element of a retaliation claim. *See Levesque v. City of Toledo*, No. 3:10-cv-606, 2011 U.S. Dist. LEXIS 21881 at * 20 (N.D. Ohio Jan. 27, 2011) (plaintiff's statement that she was "harassed repeatedly . . . disciplined following each exercise of her rights . . .followed by [another employee], and monitored by supervisors" was insufficient evidence of "other retaliatory conduct" to defeat employer's motion for summary judgment).

In any event, the conduct alleged by Ms. Bruno is not retaliatory or harassing. Ms. Bruno does not allege that she was disciplined or even that her requests for vacation or

leave were denied; she merely alleges she was asked if she "could" reschedule a vacation and required to make up time for which she was out of the office. The Court refuses to draw the inference that Citizens discharged Ms. Bruno for impermissible reasons from these allegations.

### c. There is no evidence that Mr. Egan or Mr. Terry are trying to evade liability for an alleged unlawful employment action.

Ms. Bruno argues that the testimony between Mr. Egan and Mr. Terry regarding who made the ultimate decision to terminate her employment is unclear, and argues a reasonable finder of fact could infer from this that "neither is willing to accept responsibility for making a decision which violates state and federal anti-discrimination laws." (Doc. 21 at 12).

The Court does not agree. The testimony of Mr. Egan and Mr. Terry is consistent that Ms. Bruno's position was eliminated during the Reduction in Force (Doc. 25 at 24:5-16; Doc. 26 at 40:5-15) and they both admit they were involved in that decision (Doc. 25 at 23:3-5; Doc. 26 at 37:23-41:8). Nothing the testimony of Mr. Egan or Mr. Terry suggests the decision to terminate Ms. Bruno's employment was unlawful or that they are trying to escape culpability.

### d. The fact that Ms. Bruno was the only person in her position or salary grade to be terminated is irrelevant.

Ms. Bruno argues the Court can infer a retaliatory motive from the fact that she was the only one of the four Group Underwriting Managers, and the only salary grade 17 employee, to lose her job in the Reduction in Force. (Doc. 21 at 12-14).

The Court does not agree for two reasons. First, Ms. Bruno's argument focuses on title and salary grade but completely ignores the different organizational structures at the four HLS sites. The changes made by Citizens during the Reduction in Force do not suggest a retaliatory motive; they suggest Citizens reorganized each site so as to only have one layer of underwriting management at each location.

Prior to the Reduction in Force Ms. Bruno was the second layer of management at the Cincinnati Site: the individual underwriters reported to one of two Regional Underwriting Managers who in turn reported to Ms. Bruno. (Doc. 24 at 70:8-19). Accordingly, when Ms. Bruno was discharged, the Cincinnati Site went from having two layers of management to one. *Id.*

The only other HLS location to operate with two distinct layers of underwriting management was the Rhode Island Site. Prior to the Reduction in Force, underwriters at that site reported to three Regional Underwriting Managers who in turn reported to the Group Underwriting Manager (Mr. Gausland). (Doc. 25 at 35:11-15). The Rhode Island Group Underwriting Manager position was eliminated during the Reduction in Force. (Doc. 26 at 44:23-45:9; Doc. 26-1). As a result, just like in Cincinnati, the Rhode Island Site went from having two layers of management to one.

The Court does not afford any evidentiary weight to the fact that Ms. Miceli and Mr. Owens, the Group Underwriting Managers at the New York and Virginia Sites, kept their jobs. Prior to the Reduction in Force, underwriters at both the New York and Virginia sites reported to Ms. Miceli and Mr. Owens directly without an intervening layer

of Regional Underwriting Managers.[11] Ms. Miceli and Mr. Owens were not just the

second layer of a two-layer management structure like Ms. Bruno (or Mr. Gausland);

they were the sole layer of management above the underwriters who reported to them.

The Court will not infer that Ms. Bruno's discharge was the result of retaliation from the

fact that Ms. Miceli and Mr. Owens remained employed because the Court does not view

these individuals as "similarly situated" to Ms. Bruno.

Second, even if the Court were to view Ms. Miceli and Mr. Owens as "similarly

situated" to Ms. Bruno, the Court is unable to infer retaliation because Ms. Bruno did not

set forth any evidence they did *not* engage in a protected activity prior to the Reduction in

Force. *See Keller v. Ind. Family & Soc. Servs. Admin.*, 639 F. Supp. 2d 928, 945 (S.D.

Ind. 2009) (finding defendant-employer was entitled to summary judgment on plaintiff-

employee's retaliation claim when the plaintiff-employee failed to set forth evidence that

other employees "did not engage in protected activity and were treated more favorably

than he was") (emphasis added).

> ## 2. Citizens articulated a legitimate, non-discriminatory reason for Ms. Bruno's discharge.

---

[11] Mr. Owens' situation was unique: prior to the Reduction in Force, half of the Virginia underwriters reported to Mr. Owens; the other half reported to a Regional Underwriting Manager who in turn reported to Mr. Owens. (Doc. 20-1 at ¶¶10-11). After the Reduction in Force, he exclusively managed underwriters. (*Id.* at ¶ 43). Mr. Owens was never a distinct "second layer" of management like Mr. Gausland or Ms. Bruno, and the fact that Citizens eliminated the portion of his duties that included managing another manager is consistent with its stated goal of eliminating unnecessary layers of management.

Even if Ms. Bruno were able to make a *prima facie* showing of retaliation, that would not end the Court's analysis. The burden would shift to Citizens to articulate a non-discriminatory reason for its actions. *Mickey*, 516 F.3d at 562.

Citizens claims Ms. Bruno was discharged as part of its corporate initiative to eliminate excessive layers of management. (Doc. 20 at 15-16; *see also* Doc. 25 at 24:5-16; Doc. 26 at 40:5-15). The Court finds Citizens has met its burden to provide a non-discriminatory reason for its actions. *See Schuch v. Savair, Inc.*, 118 Fed. App'x 16, 23 (6th Cir. 2004) (holding defendant set forth a legitimate, non-discriminatory reason for plaintiff's termination by presenting evidence that plaintiff's position was eliminated as part of a cost-saving reorganization effort).

### 3. Ms. Bruno has not shown Citizens' reason is pretext for retaliation.

Ms. Bruno argues the Reduction in Force is merely pretext for Citizens' unlawful retaliation. (Doc. 21 at 15-20). The Court does not agree.

A plaintiff can demonstrate pretext by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (citation omitted).

Here, it is undisputed that the Reduction in Force occurred and that, as a result, Citizens eliminated the Group Underwriting Manager position at the Cincinnati Site.[12]

---

[12] *See* note 10, *supra*.

Ms. Bruno sets forth three arguments seemingly aimed the second option, that the Reduction in Force was not the actual motivation behind her discharge.

First, Ms. Bruno claims the testimony of Mr. Egan and Mr. Terry regarding who decided to terminate her employment is inconsistent, and argues these inconsistencies create an issue of fact as to whether the Reduction in Force was really the reason for her discharge. (Doc. 21 at 16-19).

The Court does not agree. In some cases, Courts have found pretext when an employer presents inconsistent justifications as to why it terminated an employee. *See Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997) (finding inconsistent testimony regarding who decided to fire an employee and what the real reason for the decision was created an issue of fact as to pretext); *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 540 (6th Cir. 2014). As the Sixth Circuit has acknowledged, inconsistent justifications may create an issue of fact as to what the real reason for termination was and create an inference that the proffered reasons are pretext for unlawful action:

> Shifting justifications over time calls the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was pretext for discrimination.

*Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002).

That is not the case here. The Court has reviewed the testimony of both Mr. Egan and Mr. Terry and finds them consistent in all material aspects. Mr. Egan and Mr. Terry

both admit that they were involved in the decision to terminate Ms. Bruno's employment. (Doc. 25 at 23:3-5; Doc. 26 at 37:23-41:8). Importantly, Mr. Egan and Mr. Terry are consistent that the *reason* for this decision was Citizens' effort to decrease underwriting management in the Cincinnati office from two layers of management to one. (Doc. 25 at 24:5-16; Doc. 26 at 40:5-15). To the extent they exist, the inconsistencies in their testimony are simply not enough to cause the Court to question whether the Reduction in Force was the real reason for Ms. Bruno's termination. *See Muir v. Chrysler LLC*, 563 F. Supp. 2d 783, 795 (N.D. Ohio 2008) (inconsistencies in testimony do not show pretext when they "do not show the proffered reason lacks factual support or motivation for the decision.").

Second, Ms. Bruno repeats her argument that she *must* have been retaliated against because she was the only Group Underwriting Manager to lose her job, and because several Group Processing Managers—who were also salary grade 17 employees—were reassigned to Pod Leader positions, while Ms. Bruno was discharged. (Doc. 21 at 13).

For a number of reasons, the Court does not agree. Ms. Bruno's argument regarding the other Group Underwriting Managers fails for the reasons set forth in Section IV(B)(1)(d), *supra*. Ms. Bruno's attempt to assign a retaliatory motive to the fact that some Group Processing Managers were reassigned to Pod Leader positions fails because employees in the processing department perform different functions than those in the underwriting department (*see* Doc. 26 at 16:22-17:11) and there are no facts suggesting the Group Processing Managers are "similarly situated" to Ms. Bruno other

30

than their salary grade, which is insufficient by itself to make these employees proper comparators.  *See Thomas v. Kmart Corp.*, No. 4:04CV-171-M, 2006 U.S. Dist. LEXIS 71475 at ** 15-16 (W.D. Ky. Sept. 28, 2006) (holding an employee was not similarly situated to other employees who "received essentially the same salary" because "the record indicates that their job responsibilities were different.").

And again, Ms. Bruno's conclusory assertion that "[t]he one factor which distinguished [her] from the other HLS Group Underwriting Managers and salary grade 17 Group Processing Managers was that she engaged in a protected activity" is woefully unsupported by the record, as she has not provided any evidence that any Citizens employee who kept his or her job *did not* engage in any protected activity.

Third, and finally, Ms. Bruno argues that Mr. Terry could have fired one of the Cincinnati Regional Underwriting Managers, Mr. Barton or Ms. Dabney-Battle, and replaced them with Ms. Bruno, but he "inexplicably" did not.  (Doc. 21 at 20).

The Court does not agree.  The evidence on this issue is that the Cincinnati underwriters already reported to the Regional Underwriting Managers prior to the Reduction in Force, and Citizens did not want to interrupt those established working relationships.  (Doc. 26 at 43:17-44:3).  The Court will not second guess this decision. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("it is inappropriate for the judiciary to substitute its judgment for that of management."); *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.

1999) ("[o]ur role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.").

## V.     CONCLUSION

Accordingly, for these reasons, Citizens' motion for summary judgment (Doc. 20) is **GRANTED**.  The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** in this Court.


Date:   5/30/17

Timothy S. Black
United States District Judge